## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **KENNETH R. WRIGHT,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:13cv00030 |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **REPORT AND RECOMMENDATION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Kenneth R. Wright, ("Wright"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

Case 2:13-cv-00030-JPJ-PMS Document 19 Filed 11/14/14 Page 1 of 22 Pageid#: 630

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Wright protectively filed an application for DIB on May 14, 2009, alleging disability as of November 1, 2007,[1] due to back and neck pain, silicosis[2] of the lungs, right arm and hand pain and numbness, depression, hypertension, stomach problems, bilateral hearing loss, feet and leg pain, insomnia and colon problems. (Record, ("R."), at 15, 207-09, 231, 285, 299.) The claim was denied initially and on reconsideration. (R. at 118-20, 124-26, 129-32, 134-36.) Wright then requested a hearing before an administrative law judge, ("ALJ"). (R. at 137.) The hearing was held on December 14, 2011, by video conferencing, at which Wright was represented by Jennifer Morgan, a paralegal. (R. at 31-81.)

By decision dated December 30, 2011, the ALJ denied Wright's claim. (R. at 15-25.) The ALJ found that Wright met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2011.[3] (R. at 17.)

---

[1] Wright initially alleged an onset date of December 1, 2006. (R. at 207.) However, he amended his alleged onset date to November 1, 2007, at his hearing. (R. at 34.)

[2] Silicosis is defined as a disease of the lungs caused by continued inhalation of the dust of minerals that contain silica and characterized by progressive fibrosis and a chronic shortness of breath. *See* STEDMAN'S MEDICAL DICTIONARY, ("Stedman's"), 762 (1995).

[3] Therefore, Wright must show that he became disabled between November 1, 2007, the alleged onset date, and March 31, 2011, the date last insured, in order to be entitled to DIB

-2-

The ALJ also found that Wright had not engaged in substantial gainful activity since November 1, 2007, the alleged onset date. (R. at 17.) The ALJ found that the medical evidence established that, through the date last insured, Wright suffered from severe impairments, namely mild cervical degenerative changes, silicosis, borderline intellectual functioning, panic attacks and depression/dysthymia, but she found that Wright did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17-21.) The ALJ also found that, through the date last insured, Wright had the residual functional capacity to perform simple, routine, light work[4] that allowed him to frequently climb ramps and stairs, to balance, to kneel, to crawl, to stoop and to crouch, that did not require more than moderate exposure to temperature extremes, that did not require working around hazardous machinery, unprotected heights, vibration or climbing ropes or scaffolds, that did not require more than superficial interaction with co-workers and that did not require verbal interaction with co-workers or contact with the public. (R. at 21.) The ALJ found that, through his date last insured, Wright was unable to perform his past relevant work. (R. at 23.) Based on Wright's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Wright could perform, including the job as a laundry worker, a hand packager, an auto detailer and a housekeeper/cleaner. (R. at 23-24.) Thus, the ALJ found that Wright was not

benefits.

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2013).

-3-

under a disability as defined under the Act and was not eligible for benefits at any time from November 1, 2007, the alleged onset date, through March 31, 2011, the date last insured. (R. at 25.) *See* 20 C.F.R. § 404.1520(g) (2013).

After the ALJ issued her decision, Wright pursued his administrative appeals, (R. at 10), but the Appeals Council denied his request for review. (R. at 1-4.) Wright then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2013). The case is before this court on Wright's motion for summary judgment filed January 14, 2014, and the Commissioner's motion for summary judgment filed February 18, 2014.

## II. Facts

Wright was born in 1956, (R. at 35, 207), which classifies him as a "person of advanced age" under 20 C.F.R. § 404.1563(e). Wright has a limited education[5] and past relevant work experience as a strip miner, a heavy equipment operator and an assisted living aide. (R. at 36, 38, 73, 226-29, 232, 238.)

Medical expert, Marshall D. Tessnear, Ph.D., a licensed psychologist, testified at Wright's hearing. (R. at 52-56, 485.) Tessnear stated that a review of the medical evidence indicated that Wright suffered from a dysthymic disorder,

---

[5] Although Wright testified that he had only a sixth-grade education, (R. at 36), and indicated that he had a seventh-grade education when he applied for benefits, (R. at 235), his school records suggest that he had completed at least the eighth grade and attended school until tenth grade. (R. at 229.) Even though he testified that he attended special education classes in school, he denied being in special education on forms completed in connection with his application. (R. at 36, 235.)

-4-

some panic attacks and that he was functioning in the borderline range of intellectual functioning. (R. at 55.) He stated that these impairments did not meet or equal a listing, but that they would present some functional limitations, such as precluding him from working with the general public and performing complex or highly detailed work and would limit him to only superficial minimal transactions with co-workers that did not require verbal interaction. (R. at 55.) Tessnear explained that Wright's IQ scores suggested that he was functioning in the borderline range of intelligence, not the mental retardation range, despite his full-scale IQ score of 64, because Wright was having vision difficulties that pulled his overall score down. (R. at 54.)

Medical expert, Dr. Gore David Stevens, M.D., a board certified neurosurgeon, also testified at Wright's hearing. (R. at 57-71.) Dr. Stevens reviewed the medical evidence and testified that there was no actual definitive diagnosis of any type of serious physical problem documented in the record. (R. at 58.) Dr. Stevens explained that Wright did not have a ventral hernia. (R. at 58.) He pointed out that, although Wright was referred for treatment for irritable bowel syndrome, there was no documentation of such treatment. (R. at 58-59.) Although Wright was diagnosed with prostatism,[6] Dr. Stevens stated that it was a common problem with older men that was not disabling. (R. at 59.) Instead, Dr. Stevens testified that prostatism is treatable and would not prevent Wright from working. (R. at 70.)

---

[6] Prostatism is defined as a disorder characterized by decreased force of urination and dysuria, usually resulting from enlargement of the prostate. *See* Stedman's at 679.

-5-

Dr. Stevens also reviewed the medical source statement from Wright's treating physician, Dr. Thomas E. Roatsey, D.O., but stated that the severe limitations identified were not substantiated by the evidence of record. (R. at 59-60.) Similarly, Dr. Stevens considered the limitations identified by the consultative examiner, Dr. Kevin Blackwell, D.O., and also stated that Dr. Blackwell's physical examination findings, including the range of motion chart, were all within normal limits. (R. at 60-61, 368, 371.) Dr. Stevens explained that there was no reason that Wright had physical or mechanical problems with regard to standing or sitting, and there was no reason why Wright could not stand for six hours in a workday. (R. at 63.) Dr. Stevens stated that, based upon the record as a whole, Wright was capable of performing medium work.[7] (R. at 62.) He stated that pulmonary function studies contained in the record did not indicate that Wright's silicosis was a significant abnormality. (R. at 64.) Dr. Stevens explained that even though a lumbar spine film showed severe calcification of the abdominal aorta, this finding was not something to be concerned about because the abdominal aorta is one of the biggest vessels, so blood flow may not be obstructed, and it would not cause pain. (R. at 68-69.)

Vocational expert, Mark Alan Hallman, also was present and testified at Wright's hearing. (R. at 71-80.) Hallman was asked to consider a hypothetical individual of Wright's age, education and work history, who had the residual functional capacity to perform simple, routine, repetitive, unskilled light work that did not require more than frequent climbing of ramps and stairs, balancing,

---

[7] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2013).

-6-

kneeling, crawling, stooping and crouching, that did not require more than moderate exposure to hazardous machinery, unprotected heights, climbing ladders, ropes and scaffolds, working on vibrating surfaces and no more than moderate exposure to extreme temperatures, that did not require interactions with the general public and that allowed for only superficial interaction with co-workers and supervisors, but no verbal contact or interaction with them. (R. at 73-74.) Hallman stated that there would be a significant number of jobs available that such an individual could perform, including jobs as a housekeeper/cleaner, a merchandise marker and a cannery machine tender. (R. at 76-77.) Hallman was asked to assume the same individual, but who had the residual functional capacity to perform medium work. (R. at 74-75.) Hallman stated that such an individual could perform the jobs of a laundry worker, a housekeeper/cleaner, a hand packager and an automobile in-taker, all of which existed in significant numbers. (R. at 75-76.) Hallman stated that there would be no jobs available should the individual be off task 30 to 40 percent of the workday. (R. at 77.) When asked to consider the same individual, but who would require bathroom breaks up to 30 times a day, there would be no jobs available that such an individual could perform. (R. at 78.)

In rendering her decision, the ALJ reviewed medical records from Dr. Thomas E. Roatsey, D.O.; Dr. Joseph Duckwall, M.D., a state agency physician; Joseph Leizer, Ph.D., a state agency psychologist; Dr. Richard Surrusco, M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychologist; Dr. Michael Hartman, M.D., a state agency physician; Dr. G. S. Kanwal, M.D.; Dr. Christopher Starnes, M.D.; Norton Community Hospital; Dr. Kevin Blackwell, D.O.; Mary Elizabeth Ballard, M.A., a psychological examiner; Diane L.

Whitehead, Ph.D., a licensed clinical psychologist; Indian Path Medical Center; Norton Surgical Center; Wise Medical Group; Mountain View Regional Medical Center; and University of Virginia Health System.

On February 6, 2007, Wright saw Dr. Christopher Starnes, M.D., to establish a new primary care physician. (R. at 351.) On May 7, 2007, Wright reported that he was "doing okay." (R. at 326.) Examination was normal. (R. at 326.) He was diagnosed with chronic pain and anxiety. (R. at 326.) On July 6, 2007, Wright complained of shortness of breath upon standing. (R. at 338.) He was diagnosed with shortness of breath and questionable chronic obstructive pulmonary disease, ("COPD"). (R. at 338.) A chest x-ray taken on July 9, 2007, showed no acute cardiopulmonary disease. (R. at 341.) On August 6, 2007, Wright reported that he was "doing well." (R. at 350.) On September 4, 2007, Wright again reported that he was "doing well," and that his pain was stable. (R. at 337.) On November 2, 2007, Wright reported that he had "good pain control." (R. at 335.) Wright's physical examination showed no abnormalities. (R. at 335.) Dr. Starnes diagnosed chronic low back pain and hypertension. (R. at 335.) On December 27, 2007, Wright reported that he was "doing well." (R. at 349.) Dr. Starnes's examination was positive for symptoms of acute sinusitis, but was otherwise normal. (R. at 349.)

On January 25, 2008, Wright reported that he was doing well and that his pain was "well controlled" on Lortab. (R. at 334.) Examination showed no abnormalities. (R. at 334.) On February 25, 2008, Wright reported that he was doing well. (R. at 348.) He reported that his back pain was well-controlled with

-8-

Lortab. (R. at 348.) He also reported that his blood pressure was controlled. (R. at 348.) Physical examination was normal, except for back pain. (R. at 348.) On March 24, 2008, Wright reported that he was "doing okay," but that he had poor pain control. (R. at 333.) His examination was normal. (R. at 333.) On May 23, 2008, Wright complained of anxiety resulting from his financial situation. (R. at 332.) Myalgias, arthralgias and muscle spasms were noted in Wright's lower back. (R. at 332.) On June 23, 2008, Wright's physical examination was normal. (R. at 331.) On August 15, 2008, it was noted that Wright's blood pressure was controlled. (R. at 346.) On October 13, 2008, Wright complained of low back pain and leg pain. (R. at 345.) His blood pressure was controlled. (R. at 345.) On November 19, 2008, Wright complained of low back pain. (R. at 329.) His pain was reported as stable. (R. at 329.) On April 8, 2009, Wright reported that he was doing well and that his pain was well-controlled. (R. at 342.)

On August 4, 2009, Wright sought treatment at Wise Medical Group as a new patient. (R. at 380.) Wright reported a history of mood disorder, hypertension, low back pain, right knee pain, COPD and silicosis. (R. at 380.) Wright's blood pressure reading was 134/78. (R. at 380.) His lungs were clear to auscultation. (R. at 380.) Wright's heart had a regular rate and rhythm. (R. at 380.) His abdomen was neither tender nor distended. (R. at 380.) A neurological examination revealed a normal gait and sensation. (R. at 380.) Wright's affect was normal. (R. at 380.) Dr. Esther Adade, M.D., diagnosed a mood disorder, hypertension and low back pain. (R. at 380.) On September 4, 2009, Dr. Adade noted that Wright's hypertension was "very well controlled." (R. at 379.) On November 4, 2009, Wright complained of a skin rash and abdominal pain. (R. at 378.) An abdominal

examination revealed no abnormalities. (R. at 378.) Dr. Adade referred Wright for a hernia evaluation. (R. at 378.) On February 3, 2010, Wright's blood pressure was "doing well" at 118/76. (R. at 407.) He was diagnosed with probable COPD, but pulmonary function studies were not obtained due to a lack of insurance. (R. at 407.) Wright returned for the last time on April 16, 2010, to request that disability forms be completed, which are not included in the record, and also requested that his records be transferred to Dr. Roatsey. (R. at 444-45.)

On August 21, 2009, a pulmonary function test was performed at Norton Community Hospital. (R. at 353-61.) It was noted that Wright put forth good effort and was cooperative and understanding. (R. at 353.)

On March 28, 2010, Wright presented to the emergency room at Mountain View Regional Medical Center for complaints of urinary frequency and back pain. (R. at 425-34.) An abdominal ultrasound showed no acute abnormality. (R. at 408.) Wright was diagnosed with flank pain and prostatitis. (R. at 427.)

On April 26, 2010, Dr. Roatsey saw Wright for complaints of low back pain and problems with his lungs. (R. at 437-38.) Dr. Roatsey reported that Wright was alert and oriented and in no acute distress. (R. at 438.) Wright had full range of motion in his neck. (R. at 438.) He had decreased breath sounds with prolonged exertion. (R. at 438.) Wright's heart had regular rate and rhythm. (R. at 438.) He had tenderness in the lumbar spine region. (R. at 438.) Straight leg raising tests were negative. (R. at 438.) Wright had no problem with toe walking, but had some weakness with toe to heel walking. (R. at 438.) Dr. Roatsey diagnosed chronic low

-10-

back pain, COPD and hypertension. (R. at 436, 438.) He opined that Wright could lift items weighing up to 15 pounds and push and pull items weighing up to 20 pounds. (R. at 436.) He opined that Wright could not bend, squat, crawl, crouch, balance or climb. (R. at 436.)

That same day, Dr. Roatsey completed a medical assessment indicating that Wright could occasionally lift and carry items weighing 15 pounds and frequently lift and carry items weighing 10 pounds. (R. at 439-41.) He opined that Wright could stand and/or walk up to two hours in an eight-hour workday and that he could do so for 30 minutes without interruption. (R. at 439.) Dr. Roatsey opined that Wright could sit up to four hours in an eight-hour workday and that he could do so for one hour without interruption. (R. at 440.) He opined that Wright could not climb, stoop, kneel, balance, crouch or crawl. (R. at 440.) Dr. Roatsey reported that Wright's abilities to reach, to handle and to push/pull were affected by his impairments. (R. at 440.) He also opined that Wright was restricted from working around heights, moving machinery and temperature extremes. (R. at 441.)

On September 14, 2010, Wright complained of abdominal pain in his hernia. (R. at 535.) He reported that his benign prostatic hypertrophy was "doing okay" with medication. (R. at 525.) On March 30, 2011, Dr. Roatsey reported that Wright's ventral hernia was fairly stable. (R. at 532.) Wright's musculoskeletal examination showed tenderness and a decreased range of motion. (R. at 532.) On July 14, 2011, Wright voiced no complaints. (R. at 558.) On October 24, 2011, Wright reported feeling well with no complaints, except for decreased energy level and sleeping poorly. (R. at 552-55.) Physical examination was normal. (R. at 553-

-11-

54.) Dr. Roatsey reported that Wright demonstrated appropriate judgment and insight, and he had normal attention span and concentration. (R. at 554.) Wright's mood and affect were normal. (R. at 554.) By an undated letter, Dr. Roatsey stated that Wright was unable to work due to multiple medical problems, including severe chronic back pain, a very large ventral abdominal hernia, benign prostatic hypertrophy with urinary obstructions, depression and anxiety. (R. at 7.) He stated that Wright was totally disabled. (R. at 7.)

On August 29, 2009, Dr. Kevin Blackwell, D.O., examined Wright at the request of Disability Determination Services. (R. at 368-72.) Dr. Blackwell reported that Wright did not appear to be in any acute distress. (R. at 371.) He was alert, cooperative and oriented with good mental status. (R. at 371.) Wright appeared to be able to hear normal conversational levels. (R. at 371.) Wright's breathing was not labored, and his inspiratory and expiratory effort was good. (R. at 371.) His lungs were clear to auscultation. (R. at 371.) Wright had a symmetrical and balanced gait; his shoulder and iliac crest height was good and equal bilaterally; upper and lower joints had no effusions or obvious deformities; his upper and lower extremities were normal for size, shape, symmetry and strength; he had good grip strength; fine motor movement and skill activities with his hands were normal; and his upper and lower reflexes were within normal limits. (R. at 368, 371.) A chest x-ray showed no acute cardiopulmonary disease. (R. at 363.) X-rays of Wright's cervical spine showed mild degenerative changes with loss of the lordotic curvature. (R. at 364.) X-rays of Wright's lumbar spine showed no acute changes, and calcification of the abdominal aorta was noted. (R. at 365.) Dr. Blackwell diagnosed probable bilateral foot plantar fasciitis; silicosis of the lungs,

-12-

by history; chronic low back pain and neck pain; and depression and anxiety, by history. (R. at 371-72.)

Dr. Blackwell opined that Wright could occasionally lift and carry items weighing up to 45 pounds and frequently lift and carry items weighing up to 20 pounds. (R. at 372.) He opined that Wright could sit for eight hours in an eight-hour workday, with normal positional changes; stand for two hours in an eight-hour workday, with positional changes every 45 minutes; operate a motor vehicle two-thirds of the day; bend at the waist along with kneeling one-third of the day; avoid squatting, stooping, crouching or crawling and unprotected heights; perform ladder and stair climbing and foot pedal operation less than one-third of the day; perform above head reach activities of items weighing no more than 10 pounds up to one-third of the day; had no limitations with hand usage, including fine motor movements and skill activities; and should avoid extreme heat and cold and dusty environments. (R. at 372.) No vision, communicative or hearing limitations were noted. (R. at 372.)

On September 15, 2009, Joseph Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Wright suffered from an anxiety-related disorder resulting in mild restrictions of his activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 86-87.) Leizer also indicated that Wright had not experienced repeated episodes of decompensation for extended durations. (R. at 86.) He opined that Wright's limitations appeared to be related to pain rather than psychological factors. (R. at 86.)

-13-

On September 15, 2009, Dr. Richard Surrusco, M.D., a state agency physician, opined that Wright had the residual functional capacity to perform light work. (R. at 88-89.) He opined that Wright could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl and occasionally climb ladders, ropes and scaffolds. (R. at 88-89.) No manipulative, visual or communicative limitations were noted. (R. at 89.) Dr. Surrusco reported that Wright should avoid moderate exposure to fumes, odors, dusts, gases, poor ventilation and working hazards. (R. at 89.)

On March 4, 2010, Julie Jennings, Ph.D., a state agency psychologist, completed a PRTF indicating that Wright suffered from an anxiety-related disorder resulting in mild restrictions of his activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 99.) Jennings also indicated that Wright had not experienced repeated episodes of decompensation for extended durations. (R. at 99.) She opined that Wright's limitations appeared to be related to pain rather than psychological factors. (R. at 99.)

On March 4, 2010, Dr. Michael Hartman, M.D., a state agency physician, opined that Wright had the residual functional capacity to perform light work. (R. at 101-02.) He opined that Wright could occasionally climb ramps and stairs, frequently balance, stoop, kneel, crouch and crawl and never climb ladders, ropes and scaffolds. (R. at 101.) No manipulative, visual or communicative limitations were noted. (R. at 102.) Dr. Hartman reported that Wright should avoid moderate exposure to fumes, odors, dusts, gases, poor ventilation and working hazards. (R.

-14-

at 102.)

On November 5, 2010, Wright was seen at University of Virginia Health System, ("UVA"), for complaints of abdominal pain in the setting of a presumed ventral hernia. (R. at 541-43.) Physical examination was normal. (R. at 543.) Wright had normal breath sounds and no respiratory distress. (R. at 543.) His mood, affect, behavior and thought content were normal. (R. at 543.) It was noted that Wright had no evidence of a ventral hernia. (R. at 543.) Wright did have a minor interior chest deformity with a protruding xiphoid process[8] and a midline abdominal wall diastasis, neither of which required surgical intervention. (R. at 543.) Wright was referred to a gastroenterologist for irritable bowel syndrome. (R. at 543.) He also was referred to a urologist for his complaints of urinary urgency, frequency and frequent urinary tract infections. (R. at 543.)

On December 17, 2010, Mary Elizabeth Ballard, M.A., a psychological examiner, and Diane L. Whitehead, Ph.D., a licensed clinical psychologist, evaluated Wright at the request of Disability Determination Services. (R. at 472-79.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Wright obtained a full-scale IQ score of 64. (R. at 477.) Ballard and Whitehead diagnosed dysthymic disorder; panic disorder without agoraphobia; and borderline intellectual functioning. (R. at 479.) Wright's then-current Global Assessment of Functioning score, ("GAF"),[9] was assessed at 52,[10] with his highest

---

[8] Xiphoid process is defined as the cartilage at the lower end of the sternum. *See* Stedman's at 902.

[9] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and

and lowest GAF scores within the past six months also being 52. (R. at 479.)

Ballard and Whitehead completed a mental assessment, indicating that Wright had a mild limitation in his ability to understand, remember and carry out simple instructions, to make judgments on simple work-related decisions, to interact appropriately with the public and with supervisors and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 480-82.) They indicated that Wright had a satisfactory ability to understand, remember and carry out complex instructions, to make judgments on complex work-related decisions and to interact appropriately with co-workers. (R. at 480-81.)

On March 24, 2011, Wright was admitted to Indian Path Medical Center for complaints of chest pain. (R. at 489-529.) Both mental and neurological examinations were normal. (R. at 501.) X-rays of Wright's chest were unremarkable except for a healed mid left clavicular fracture. (R. at 487.) Wright's stress test was normal. (R. at 527-28.) He was diagnosed with chest pain and tobacco abuse. (R. at 498.)

---

occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[10] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

-16-

### III.  Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2013); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2013).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Wright argues that the ALJ improperly determined his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) Wright argues that the ALJ erred by relying

on the opinions of the state agency medical consultants rather than the opinions of Dr. Blackwell and Dr. Roatsey. (Plaintiff's Brief at 6-7.)

The ALJ found that the medical evidence established that, through the date last insured, Wright suffered from severe impairments, namely mild cervical degenerative changes, silicosis, borderline intellectual functioning, panic attacks and depression/dysthymia. (R. at 17.) The ALJ also found that, through the date last insured, Wright had the residual functional capacity to perform simple, routine, light work that allowed him to frequently climb ramps and stairs, balance, kneel, crawl, stoop and crouch, that did not require more than moderate exposure to temperature extremes, that did not require working around hazardous machinery, unprotected heights, vibration or climbing ropes or scaffolds, that did not require more than superficial interaction with co-workers and that did not require verbal interaction with co-workers or contact with the public. (R. at 21.)

Based on my review of the record, I find that substantial evidence exists to support the ALJ's finding that Wright had the residual functional capacity to perform a limited range of light work. The medical evidence shows that Wright repeatedly reported that he was doing well and that his pain was well-controlled with medication. (R. at 326, 331, 333-35, 337, 342, 345-46, 348-50.) Physical examinations were normal, and Wright's hypertension was controlled. (R. at 326, 331, 333-35, 344-46, 348, 368, 371, 379-80, 407, 535, 553-54.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

The ALJ's residual functional capacity finding is supported by the opinions

-18-

of two medical experts, who reviewed the medical evidence of record and were present for Wright's testimony. (R. at 52-71.) Specifically, the psychological expert, Tessnear, concluded that, despite Wright's dysthymic disorder, panic attacks and borderline intellectual functioning, Wright retained the ability to perform work that did not require him to perform complex or highly detailed work, working with the public or having more than superficial and minimal interaction with co-workers. (R. at 54-55.) Dr. Stevens testified that there was no definitive diagnosis of any type of serious physical problem documented in the record and that Wright had the residual functional capacity to perform medium work. (R. at 58, 62.) Furthermore, state agency physicians opined that Wright retained the ability to perform light work with postural and environmental limitations. (R. at 88-89, 101-02.)

While Wright asserts that the ALJ should have credited the opinions of Drs. Roatsey and Blackwell, indicating that Wright was more limited that the ALJ found, I do not agree. Under the regulations, a physician's opinion must not be inconsistent with the other evidence of record and well supported with examination findings and diagnostic studies. *See* 20 C.F.R. § 404.1527(c)(3)-(4) (2013). The ALJ accepted the opinions of the medical experts who testified at Wright's hearing because their opinions were consistent with the objective medical evidence and Wright's treatment history. (R. at 23.) Dr. Blackwell's physical examination findings were within normal limits. (R. at 368, 371.) Dr. Stevens testified that Wright had no physical or mechanical problem with regard to standing or sitting, and there was no reason why Wright could not stand for six hours in a workday. (R. at 63.) Dr. Blackwell found that Wright was precluded from exposure to all respiratory irritants even though his examination revealed no abnormalities of the

-19-

lungs. (R. at 372.) Pulmonary function studies do not indicate that Wright's silicosis was a significant abnormality. (R. at 353-61.) A chest x-ray showed no acute cardiopulmonary disease. (R. at 341.)

The ALJ also properly gave less weight to Dr. Roatsey's April 2010 assessment, which suggested that Wright was incapable of even sedentary work. (R. at 439-41.) Dr. Roatsey opined that Wright was permanently disabled due to severe chronic back pain, a very large ventral abdominal hernia, benign prostatic hypertrophy, depression and anxiety. (R. at 7.) However, his treatment notes indicate that Wright reported that his benign prostatic hypertrophy was "doing okay" with medication. (R. at 535.) Wright reported that he was feeling well and had no complaints. (R. at 552, 558.) Wright demonstrated appropriate judgment and insight and normal attention and concentration. (R. at 554.) Dr. Blackwell noted that Wright had good mental status. (R. at 371.) It was determined at UVA that there was no evidence that Wright had a ventral hernia. (R. at 543.)

The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(c)(2) (2013). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. Based on my review of the

-20-

record, I find that substantial evidence exists to support the ALJ's decision to not give controlling weight to Dr. Roatsey's opinion or to Dr. Blackwell's opinion because they were not supported by the record, including thier own treatment notes. (R. at 23.)

Based on this, I find that the ALJ properly weighed the medical evidence of record. I also find that substantial evidence exists to support the ALJ's finding with regard to Wright's residual functional capacity.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's weighing of the medical and psychological evidence;

2. Substantial evidence exists in the record to support the ALJ's finding with regard to Wright's residual functional capacity; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Wright was not disabled under the Act and was not entitled to DIB benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Wright's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

-21-

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2013):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     November 14, 2014.

s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE